NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0026n.06

No. 24-3933

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 14, 2026
KELLY L. STEPHENS, Clerk

WILLIAM J. SHELTON,

  Plaintiff-Appellant,

v.

CUYAHOGA METROPOLITAN HOUSING
AUTHORITY and GREGORY DREW,

  Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

OPINION

Before: MOORE, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**

Plaintiff–appellant William Shelton sued the Cuyahoga Metropolitan Housing Authority
(CMHA), alleging First Amendment and Title VII violations. The district court dismissed the First
Amendment claims as untimely and granted summary judgment in CMHA's favor on the Title VII
claims. We **AFFIRM**.

## I. FACTUAL BACKGROUND

Shelton was an officer with the CMHA police department, beginning his career in 2016.
He worked as a detective and sometimes joined SWAT team operations. His duties included
responding to service calls, enforcing CMHA policies, and securing CMHA properties.

Shelton also describes himself as a "rap artist." Appellant's Br. at 4. Others in CMHA
were aware that Shelton rapped, including CMHA Police Chief Andreas Gonzalez and Shelton's
supervisor, Sergeant John Smiddy. Gonzalez may have even invited Shelton to perform at an

event. Shelton warned Gonzalez that his rap was "vulgar." R. 46-3 PID 2002–03. However, Shelton provides no evidence that anyone was aware of the following videos: "Head Shot," which depicts Shelton mock executing a "homeless man." R. 13, PID 169; "WAP Remix – Dry Ass Nookie," which contains graphic sexual lyrics and depicts Shelton brandishing a knife while stating, "Bitch I'm about to slay you." R. 34-28, PID 1045–50; "The Great Man Challenge," which shows Shelton sitting in the front seat of his car, holding a gun in his hand and a faux alcohol bottle in his lap, R. 34-1, PID 802–04; and "Bust Down Thotiana" and "Talk My Shit Challenge," which contain violent lyrics or derogatory comments about women. *See* R. 34-28, PID 1049–50.

Shelton has many social-media accounts, all of which are public. At least some of those accounts depicted Shelton in his CMHA uniform. Shelton posted the above videos to his public YouTube channel. Although his YouTube channel does not explicitly identify Shelton, his channel is "linked" to his other social-media pages. R. 34-1, PID 773–75.

Shelton was required to know and adhere to CMHA's policies and procedures, all of which were detailed in CMHA's "Rules and Regulations." R. 34-1, PID 575. These Rules and Regulations applied both when Shelton was on and off duty. Some of those Rules prohibited officers from violating any law; being "disrespectful or discourteous" to members of the public; or engaging in "any conduct, speech, or acts while . . . off duty that would . . . diminish the esteem of CMHA." R.34-34, PID 1058.

In "early" September 2020, Sergeant John Smiddy, Shelton's supervisor, "became aware of" the Head Shot video. R. 60-2, PID 2738. At some later point, Smiddy reported the video to Lieutenant Drew and Commander Thomas Burdyshaw. On the same day that Drew and Burdyshaw learned about the video, they reported it to Deputy Chief Victor McDowell. "A few days later," on September 18, 2020, during a regularly scheduled briefing conference, Drew and

Burdyshaw asked Chief Gonzalez if he had been briefed about Shelton's videos. R. 36-1, PID 1129–31. Gonzalez then watched the Head Shot video, which he learned had also been circulating throughout the department. Later that day, Gonzalez "escalated the matter to [his] supervisor," Chief Executive Officer Jeffery K. Patterson, informing him of the "disturbing videos."

On that same day—September 18, 2020—at around 3:30 p.m., Shelton filed a workplace harassment complaint (the details of which are discussed in the next paragraphs) with HR Director Betsy McCafferty. By that time, Gonzalez had already contacted Patterson about Shelton's video. Shelton's internal harassment complaint described twenty-four alleged incidents of racial discrimination.[1] Relevant here, Shelton complained that: Drew denied Shelton's request to leave the SWAT team; other officers were allowed to wear "Blue Lives Matter" facemasks, but Shelton was instructed not to wear a Black Lives Matter facemask; supervisors made offensive comments, such as "sometimes I don't think you know your place," and "OMG he is black." R. 34-19, PID 1016–20.

CMHA retained outside counsel to investigate Shelton's complaint. The investigation addressed each of the allegations in a seventeen-page report, finding twenty-three of the twenty-four allegations unsubstantiated, but that an officer "may have" made the "OMG he is black" comment. R.38-1, PID 1299–1302. Aside from Shelton's testimony regarding some of the above allegations (i.e. officers' comments and the facemask policy), his briefs do not cite evidence beyond the allegations in his HR complaint.

On October 7, 2020, a few weeks after Shelton filed his HR complaint, CMHA placed him on paid administrative leave, pending an investigation into alleged misconduct related to Shelton's

---

[1] Although Shelton's brief mentions that his HR complaint "detailed . . . how [Shelton] was disciplined and treated differently than other similarly situated CMHA employees because of his race," his briefing highlights only some of the HR complaint's allegations. *See* Appellant's Br. at 5–6.

videos. After a series of communications and meetings with Shelton, CMHA terminated Shelton's employment on January 29, 2021. The termination letter explained that Shelton violated CMHA's Policies and Procedures and Rules and Regulations when he posted "a series of videos of [him]self on YouTube which contain[ed] certain lyrics and depictions of violence, and lyrics that are derogatory and offensive to women and promote violence against women." R. 34-34, PID 1058. The letter then identified the five YouTube videos discussed above.

Shelton grieved his termination through his union on January 29, 2021, and filed an EEOC discrimination complaint on February 17, 2021. An arbitrator reviewed Shelton's grievance and eventually returned Shelton to work on November 28, 2022. The arbitrator reasoned that CMHA had failed to warn Shelton that his music could violate its policies, even though CMHA knew that Shelton rapped. It also noted that no members of the public had complained about the videos.

During these arbitration proceedings, in March 2022, Shelton learned that, before firing him, CMHA had retained outside legal counsel to evaluate some of Shelton's videos. Gonzalez testified in that arbitration proceeding that the review aimed to identify which videos were of personal interest and which touched on matters of public concern. Gonzalez further testified that he received a recommendation that he should "focus" his investigation on the five identified videos to determine whether those violated CMHA policies. R. 46-2, PID 1770. Shelton alleges that March 2022 was the first time he learned that outside counsel conducted what he calls a "First Amendment assessment." Appellant's Br. at 8.

## II. PROCEDURAL HISTORY

Shelton filed his initial complaint on March 10, 2023, against CMHA and his supervisor, Lt. Drew. He filed a second amended complaint on August 21, 2023, against those same defendants. Shelton's second amended complaint enumerated the following claims:

(I) 42 U.S.C. § 1983 First Amendment retaliation;

(II) CMHA's Social Media Policy Suppresses Free Speech;

(III) CMHA's Conduct Unbecoming Policy Suppresses Free Speech;

(IV) 42 U.S.C. § 1983—Fourteenth Amendment Violation;

(V) Tortious Interference with Employment Relations (only against Drew)

(VI) Interference with Civil Rights Under Ohio Revised Code § 2921.45 and § 2307.60;

(VII) Racial discrimination in violation of Title VII; and

(VIII) Retaliation in violation of Title VII.

R.13.

In December 2023, CMHA moved for partial judgment on the pleadings, seeking dismissal of all claims except the Title VII claims against CMHA. The district court modified its scheduling order on April 4, 2024, and instructed the parties to "not delay discovery until a ruling" on CMHA's motion. Discovery proceeded.

CMHA moved for summary judgment on all claims on June 28, 2024, and included four declarations. On August 9, 2024, Shelton moved to "disregard" the declarations for failing to comply with 28 U.S.C. § 1746,[2] arguing that the declarations were void because they excluded certain statutory language. R. 54. That same day, the district court ruled in a minute order that it would consider that objection only in a response to CMHA's motion for summary judgment. On August 29, 2024, CMHA filed its reply brief along with amended declarations.

The district court entered its final order on September 29, 2024, resolving the partial motion for judgment on the pleadings and the remaining claims on summary judgment. Relevant here,

---

[2] 28 U.S.C. § 1746 permits a matter to be evidenced by a declaration if the declarant includes, "in substantially the following form," "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746.

the district court held that counts I to IV were time-barred, and granted summary judgment in CMHA's favor on counts VII and VIII. This appeal followed, contesting only the decisions on counts I to IV and VII to VIII against CMHA. Shelton does not discuss the claims against Drew.

### III. ANALYSIS

#### A.    Timeliness Dismissal

(1)    *Accrual*

The district court dismissed counts I to IV as untimely under Federal Rule of Civil Procedure 12(c). This court reviews de novo that determination. *Berry v. Experian Info. Sols, Inc.*, 115 F.4th 528, 535 (6th Cir. 2024). In doing so, all well-pleaded material allegations in the complaint are taken as true and the court considers whether the moving party is nevertheless "clearly" entitled to judgment. *Jackson v. Pro. Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017).[3]

"The statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citations omitted). Accordingly, a Rule 12(c) motion, which considers only the pleadings, "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* Sometimes, however, the allegations in the complaint "affirmatively show that the claim is time-barred." *Id.* "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Lutz v. Chesapeake*

---

[3] Although the fact section above cites primarily from the summary judgment record, the complaint's allegations are accepted as true in deciding the timeliness question.

*Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)).

CMHA terminated Shelton's employment on January 29, 2021. He filed an EEOC complaint on February 17, 2021.[4] Shelton initially brought this suit on March 10, 2023. He brought his counts I to IV under § 1983, which does not provide a statute of limitations. *See* 28 U.S.C. § 1983. Instead, federal courts borrow the state's relevant personal injury statute of limitations—here two years. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Shelton concedes that Ohio's two-year statute of limitations applies here. So, absent a later accrual date or another doctrine, counts I to IV should be dismissed.

Federal law governs when a cause of action accrues. *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). Under the "standard" rule, a claim accrues when the plaintiff has "a complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201 (1997). "[A] cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Id.* That, in turn, depends "on the specific constitutional right alleged to have been infringed." *Reed v. Goertz*, 598 U.S. 230, 235–36 (2023).

Shelton styles Count I as a First Amendment Retaliation (Viewpoint) claim. R. 13, PID 176.[5] A retaliation claim has three elements: (1) the plaintiff must have engaged in protected speech, (2) the state actor must have taken an "adverse" action, and (3) a "causal connection" must exist between these elements. *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020).

---

[4] The district court noted that the accrual date for Shelton's termination date could be as late as February 17, 2021. R. 61, PID 2811. That date still falls outside the statute of limitations, so for clarity we refer only to the January 29, 2021 date.

[5] We agree with the district court that counts I to IV are materially identical for accrual purposes, all asserting injuries connected to either Shelton's HR complaint or his videos.

Shelton sometimes identifies his music as the protected speech, and other times identifies his HR harassment complaint. We assume without deciding that both were protected and that CMHA took the adverse action—termination—because of Shelton's protected speech. Applying the standard rule to these assumptions, Shelton had a "complete and present" cause of action when his employment was terminated on January 29, 2021 due to his protected speech. *See Reguli v. Russ*, 109 F.4th 874, 880–81 (6th Cir. 2024) (reasoning that the plaintiff had a "complete and present cause of action" when an officer unlawfully searched plaintiff's social media because the officer disliked plaintiff's speech). Thus, Shelton's lawsuit, filed more than two years later, would be time-barred under the occurrence rule.

The discovery rule delays accrual until a plaintiff "knows or has reason to know that they were injured and that the defendant caused their injury." *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 704 (6th Cir. 2022). The "causation inquiry" focuses on *who* caused the injury, not *why* they did so. *See Reguli*, 109 F.4th at 884. ("The cases incorporating a causation inquiry into the discovery rule have indicated that plaintiffs must have known of the *defendant* that caused their injury—not the defendant's *subjective reasons* for doing so.") (citation modified).

Here, CMHA terminated Shelton's employment on January 29, 2021. That day, Shelton immediately knew about the injury (termination) and who was responsible (CMHA). Indeed, CMHA even noted in the termination letter why it terminated Shelton's employment, explaining that five of Shelton's videos violated CMHA's policies. Moreover, Shelton's February 2021 EEOC complaint alleged that he was fired because of his workplace complaints and rap videos. Thus, under both the standard rule and the discovery rule, counts I to IV are time barred.

Shelton urges us to hold that counts I to IV did not accrue until March 2022, when he discovered during an arbitration hearing that CMHA conducted a "First Amendment assessment"

of his videos. Shelton's conclusion rests on two flawed premises. First, he assumes that CMHA acted impermissibly in seeking legal advice to determine which of Shelton's many videos might constitute protected speech. *See* Appellant's Br. at 15 ("Without knowledge that CMHA had submitted all of his videos to an outside firm for First Amendment assessment, [Shelton] would have had no basis to bring a constitutional claim against CMHA."). But he does not explain how that review violated the Constitution or why CMHA was obligated to disclose it. Moreover, even if the review was impermissible or otherwise evinced discriminatory/retaliatory intent, Shelton's assumption that his claim would not accrue until he discovered that review is incorrect.

Shelton correctly characterizes the discovery rule, but because he misconstrues the injury and causation analyses, his cited cases are inapposite. For example, Shelton relies on *Snyder-Hill v. Ohio State University*. In that case, adult plaintiffs alleged that a university physician abused them during medical appointments when they were teenagers or young adults. *See Snyder-Hill*, 48 F.4th at 691. "Most"—but not all—of the plaintiffs alleged that, for many years, they were unaware that the doctor's actions constituted abuse. *Id.* at 694. All of the plaintiffs, however, alleged that they could not have known about the university's responsibility, contending that they were unaware that other students had previously complained to the administration about the doctor's conduct. *Id.* This court concluded that the plaintiffs' claims did not accrue until the plaintiffs "kn[ew] or should have known that [university] administrators with authority to take corrective action knew of [the doctor's] conduct and failed to respond appropriately." *Id.* at 705.

Similarly, in *Ouellette v. Beaupre*, the plaintiff sued a police department and municipality, alleging that one of its officers sexually abused him and that the department and city bore responsibility. 977 F.3d 127, 130–31 (1st Cir. 2020). Although the plaintiff reported the abuse around the time it occurred, he discovered only decades later that others had also experienced and

reported similar abuse. *Id.* The First Circuit concluded that the plaintiff's claim against the department and city did not accrue until the plaintiff had "additional information suggesting that [the department and city] were also a cause of [the plaintiff's] injur[ies]." *Id.* at 140.

Shelton's case is not analogous. In both cases, and others Shelton cites, the discovery rule postponed the accrual date until the plaintiff discovered the injury (e.g. that a doctor's conduct factually constituted abuse) or learned that a particular defendant contributed to or caused the injury. Here, Shelton should have known about his injury and its cause as soon as CMHA terminated his employment, and certainly by the time he described these injuries in his EEOC complaint. At that point, he had all of the necessary information to challenge his termination in court. Shelton says that CMHA's First Amendment review constituted part of the injury and that therefore his claim did not accrue until he discovered the review. But he does not show how that review constitutes part of his injury or explain why anyone but CMHA bore responsibility for it. In any event, Shelton knew that the reason for his firing was his videos. If these videos were protected by the First Amendment, he needed no further information to pursue that claim. That CMHA sought to make that determination before firing him simply confirms that the firing was due to the videos, something Shelton should have known. Thus, under either the standard rule or the discovery rule, Shelton's claims are time-barred.

(2) *Equitable Tolling*

To the extent the discovery rule bars counts I to IV, Shelton urges us to toll the statute of limitations. When reviewing § 1983 claims, federal courts generally look to the relevant state's equitable tolling rules. *Kato*, 549 U.S. at 395. Ohio courts employ the doctrine "to prohibit inequitable use of the statute of limitations in compelling cases which justify a departure from established procedure." *Lutz*, 717 F.3d at 474. A court may apply it "where there is some conduct

of the adverse party, such as misrepresentation, which excludes suspicion and prevents inquiry."

*Id.*

We agree with CMHA that Shelton forfeited this argument by failing to raise it below. None of his briefing in the district court discussed equitable tolling as distinct from the discovery rule. In any event, Shelton fails to identify any affirmative concealment or fraudulent misrepresentation by CMHA. He again argues, without support, that CMHA was required to disclose its First Amendment evaluation. But even assuming the point, Shelton provides no support for why such an omission entitles him to equitable tolling. We therefore decline to toll the statute of limitations, and affirm the district court's dismissal of counts I to IV as time-barred.

## B. Title VII Claims

### (1) *Declarations*

Shelton asserts that the district court erred in relying on CMHA's amended declarations, because the initial declarations violated 28 U.S.C. § 1746. This court reviews such evidentiary rulings for abuse of discretion. *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006). "A district court abuses its discretion when it relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006).

Under 28 U.S.C. § 1746, a matter may be evidenced by a declaration if the declarant includes, "in *substantially* the following form," "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746. (emphasis added). In its motion for summary judgment, CMHA attached four declarations. R. 40-1–4. All four are signed and dated. *See id.* But in each the line above the

signature reads, "SIGNED UNDER PENALTY OF PERJURY," omitting "I declare . . . that the foregoing is true and correct." *See id.*

CMHA "maintain[s] that the original declarations were proper and *substantially*" complied with § 1746's instructions. Appellees' Br. at 25. And our recent decision in *In re FirstEnergy Corp.* supports that argument. 154 F.4th 431, 439 (6th Cir. 2025). In that case, we held that a district court erred in refusing to consider a declaration that was signed "'under penalty of perjury' without swearing it '*as true* [and correct] under penalty of perjury.'" *Id.*

In any event, as the district court observed, a court has discretion to accept an amended affidavit. *See generally Collazos-Cruz v. United States*, No. 96-5452, 1997 WL 377037 (6th Cir. 1997) (per curiam) (unpublished) (finding that an amended declaration established a material fact and reversing summary judgment). In doing so here, the district court noted that CMHA "timely acted to cure the identified deficiency"; there were "no substantive differences between" the two sets of declarations; the amended declarations contained the relevant language; and CMHA submitted them before the court ruled on the summary judgment motion. R. 61, PID 2823. Under those circumstances—especially where the originals arguably comply with § 1746—we do not find that the district court abused its discretion in accepting the amended declarations.

### (2) *Waiver/Forfeiture*

Shelton for the first time argues that a plaintiff should not need to satisfy the *McDonnell Douglas* framework, nor establish a prima facie case to survive summary judgment. CMHA argues that this court should not consider Shelton's argument because he raises it for the first time on appeal. CMHA relied on *McDonnell Douglas* in its summary judgment brief, and Shelton did not challenge that standard below. "Waiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right." *Berkshire v. Dahl*, 928 F.3d 520,

530 (6th Cir. 2019) (citation modified). Shelton never "affirmatively abandoned" his *McDonnell Douglas* objection; he merely failed to raise it. Shelton, therefore, forfeited the argument. *See id.* This court considers a forfeited argument only when doing otherwise "would produce a plain miscarriage of justice" or the case involves "exceptional circumstances." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014). Shelton has shown neither. We therefore decline to address his newly raised challenge to the *McDonnell Douglas* framework.

(3)     *Summary Judgment*

This court reviews the grant of summary judgment de novo. *Lowe v. Walbro LLC*, 972 F.3d 827, 831 (6th Cir. 2020). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that there is no genuine dispute of material fact. *Id.*

*McDonnell Douglas* established a tripartite framework for discrimination claims that are based on circumstantial evidence. First, a plaintiff must establish a prima facie case. *McNeal v. City of Blue Ash*, 117 F.4th 887, 896 (6th Cir. 2024). Second, if the plaintiff makes a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. *Id.* Third, if the defendant identifies a legitimate reason, the burden shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.*

We assume without deciding that Shelton made a prima facie case that he was terminated either for his race or in retaliation for filing a discrimination complaint. Both Title VII claims fail,

however, because CMHA articulated a legitimate, nondiscriminatory reason for the termination, which Shelton did not adequately rebut. The Head Shot video depicts Shelton shooting an unarmed person. Another video shows Shelton brandishing a gun and holding a bottle of alcohol while sitting in the front seat of a car. His songs' lyrics are explicit and refer disparagingly to women. CMHA's policies barred this behavior, and Shelton conceded that those policies applied even when he was off-duty.

Shelton says that CMHA used his videos as a pretext to fire him for the HR complaint or for racially discriminatory motives, reasoning that CMHA long knew about his music. Though Shelton demonstrated that CMHA knew, for some time, that he rapped, he provides no evidence that it was aware of the specific videos at issue. Shelton's "bare assertion" that CMHA's proffered reason has no basis in fact is insufficient" to call it into question, and "fails to create a genuine issue of material fact." *Tingle v. Arbors at Hillard*, 692 F.3d 523, 531 (6th Cir. 2012). We therefore affirm the district court's decision to grant summary judgment on both Title VII claims.

## CONCLUSION

For the reasons above, we **AFFIRM**.